UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHRISTOPHER STERN**,            Case No. 1:10 CV 1961

    Plaintiff,            Judge Donald C. Nugent

v.

REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.            Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Christopher Stern seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### BACKGROUND

*Treatment History*

In November of 1993, Plaintiff (then 14 years old) underwent a vocational evaluation by the Lorain City Schools. (Tr. 95–99). Evaluators placed Plaintiff in the 16th percentile in his general learning ability, and stated he "works well when he is given frequent encouragement. He has a high tolerance for repetitive tasks and he enjoys working with his hands. He would be likely to do well in areas such as light assembly or food service." (Tr. 97–98). Also that year, psychologist Dr. Thomas Zeck evaluated Plaintiff, and opined Plaintiff fell "within the mild mental retardation range

of intelligence classification." (Tr. 179). Plaintiff's Full Scale IQ at the time was 66. (Tr. 179).

In April 1996, Plaintiff was again evaluated by Dr. Zeck (Tr. 193–196), who found Plaintiff's calculation abilities were in the borderline range, his abstract and logical thinking abilities within the low-average range, and his overall intellectual functioning was in the borderline range (Tr. 195). Plaintiff's Full Scale IQ score was 81. (Tr. 195). Dr. Zeck diagnosed Attention Deficit Hyperactivity Disorder ("ADHD") and borderline intellectual functioning. (Tr. 196).

Dr. Zeck evaluated Plaintiff again in June 1997 (Tr. 219–225), finding Plaintiff's calculation abilities within the "mental defective" range (Tr. 221), his abstract and logical thinking were within the average range, and his overall intellectual functioning was determined to be within the borderline range. (Tr. 222). Plaintiff's Full Scale IQ score was 73. (Tr. 222). Dr. Zeck diagnosed cannabis abuse, borderline intellectual functioning, and educational problems. (Tr. 225).

In July 1997, psychologist Dr. Caroline Lewin reviewed Plaintiff's records (Tr. 226–239), noting Plaintiff had a Full Scale IQ of 73 (Tr. 231). Dr. Lewin determined Plaintiff was moderately limited in his ability to (1) understand, remember and carry out detailed instructions; (2) to maintain attention and concentration for extended periods of time; (3) to maintain regular, punctual attendance; and (4) to complete a normal workday/workweek without being interrupted by psychologically based symptoms. (Tr. 236). Dr. Lewin did not find any other significant limitations (Tr. 236–237), and concluded Plaintiff "can do simple tasks" (Tr. 238).

In May 2000, psychologist Dr. Mitchell Wax examined Plaintiff, whom he believed was "making up information as he went along" and malingering. (Tr. 241, 243–244). For example, Dr. Wax noted Plaintiff initially said that he could not read, "but later it was learned he had no trouble reading the sports page of the newspaper". (Tr. 241). Dr. Wax reported that during testing, Plaintiff

"could not answer simple math questions, but later in the evaluation he was easily able to count by 3s and could do similar math problems when words were changed." (Tr. 241). Dr. Wax further stated Plaintiff "said he has no income, but later it was learned he often goes out to dinner, goes to bars, and plays pool with friends." (Tr. 241). Although Plaintiff obtained a Full Scale IQ score of 58, Dr. Wax invalidated the score due to malingering and noted, in reality, Plaintiff's "functioning appeared to be much higher". (Tr. 243). He found Plaintiff was "not restricted in his daily activities" (Tr. 244) and refrained from diagnosing any impairment due to Plaintiff's perceived malingering. (Tr. 245).

In December 2001, psychologist Dr. Ronald G. Smith evaluated Plaintiff. (Tr. 256–266). Plaintiff reported he lived alone, had worked a variety of short-terms jobs since leaving school, and enjoyed reading books and newspapers (Tr. 256–257), despite reading at the 4.2 grade level (Tr. 261). Plaintiff said he spent his days drinking beer, smoking marijuana, and watching TV with his friends or girlfriend. (Tr. 258). Dr. Smith found Plaintiff had marked limitations in his ability to carry out detailed instructions and make work-related judgments (Tr. 265), and had moderate limitations in his ability to understand and remember detailed instructions and in his ability to appropriately respond to work pressures and changes (Tr. 266). Dr. Smith reported Plaintiff's ability to maintain concentration and attention "appeared to be poor," though "he would seem to be able to successfully follow simple one or two step job instructions". (Tr. 263). Plaintiff obtained a Full Scale IQ score of 69. (Tr. 259). Dr. Smith diagnosed ADHD, alcohol and cannabis abuse, and borderline intellectual functioning. (Tr. 263).

In February 2008, Plaintiff underwent another evaluation by Dr. Smith. (Tr. 383–387). Plaintiff reported he was then working as a kitchen helper. (Tr. 384). Dr. Smith found Plaintiff's

3

speech was clear, he seemed well organized in his thinking, and his insight and judgment appeared to be fair. (Tr. 385). Dr. Smith noted a 2007 IQ score of 73. (Tr. 386). He found Plaintiff was moderately or severely impaired in his ability to understand, remember and carry out complex tasks, and might need some assistance in handling funds due to limited arithmetic ability (Tr. 387), but Plaintiff was not impaired in his ability to relate to others in a work setting, to understand, remember and follow simple instructions, to maintain attention, concentration, and persistence (provided he is performing the kinds of tasks he is capable of), or to withstand the stress and pressures of day-to-day work (Tr. 387). Dr. Smith diagnosed borderline intellectual functioning. (Tr. 386).

In March 2008, state agency psychologist Dr. Karen Terry reviewed Plaintiff's medical record to assess Plaintiff's limitations. (Tr. 390, 392–441). In summary of her various assessments, she noted Full Scale IQ scores of 66, 73, and 81, and commented that a May 2000 IQ score of 58 was considered invalid because of malingering. (Tr. 422). She reported no episodes of decompensation, although she also noted Plaintiff had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. 402). Dr. Terry pointed out Plaintiff stated he "performs self-care activities, cooks for himself, cleans, does laundry, visits with friends, plays games, watches TV, eats out, plays pool with his friend, sometimes goes to Lake Erie, goes grocery shopping with his mother, and can shop independently at a local store". (Tr. 440).

In one assessment, Dr. Terry adopted Administrative Law Judge ("ALJ") Cheryl M. Rini's September 2002 determination finding Plaintiff retained the capacity for simple, routine, repetitive, low stress work. (Tr. 275, 390) (Plaintiff was denied disability benefits in September 2002 (Tr. 270–75)). Similarly, she also found Plaintiff retained the ability to perform work that does not require strict production quotas and is performed in low stress settings, does not require frequent

change, and involves only minimal and superficial contact with others. (Tr. 440). She also found that instructions should be presented visually to Plaintiff because of his low reading level. (Tr. 440).

*Administrative Hearing*

In January 2009, Plaintiff, represented by counsel, testified before an ALJ. (Tr. 470–509). Plaintiff testified that since 2002, he had held a variety of jobs, including work at a neighborhood housing project, Kentucky Fried Chicken, Elyria Plastics, and McDonald's, but generally those jobs lasted only a few months. (Tr. 475–82). Plaintiff testified he had been let go from or quit his jobs because he could not keep up with the pace. (Tr. 489). Plaintiff held his job at McDonald's the longest, two or three years, before being let go for "goofing off" and not following the company's beard grooming policy. (Tr. 476–77). Plaintiff noted he had trouble keeping up when the restaurant was busy. (Tr. 477–81).

When questioned by the ALJ, Plaintiff said he felt he could read and write fairly well, could write letters, and could read a whole newspaper, although he sometimes needed help reading "big" words. (Tr. 486). Plaintiff admitted he had trouble with arithmetic, but stated he could add, subtract, and divide fairly well, and could use a cash register. (Tr. 486–87).

Plaintiff testified he lived alone in a rent-subsidized apartment, where he was required to do community service in exchange for not paying rent. (Tr. 490–91). As part of his community service, Plaintiff, under the supervision of another, monitored people entering and leaving the apartment complex. (Tr. 491–92). Plaintiff was responsible for, and did in fact, maintain the cleanliness of his apartment. Plaintiff said he also cooks for himself, although his girlfriend or mother occasionally make meals for him. (Tr. 493–94). Plaintiff testified that during the day he

plays video games, talks on the telephone, looks for jobs, watches television, reads the newspaper, hangs out with friends, uses a computer, and visited his apartment complex's recreational room. (Tr. 493–95, 497). Plaintiff also occasionally watches his children, and together they watch television, go to the park, go out to eat, or visit the library. (Tr. 496). Plaintiff also reads books to his children. (Tr. 496).

Vocational expert ("VE") Thomas Nimberger also testified. The ALJ asked the VE to assume a person of Plaintiff's age and education, with no past relevant work, who can perform a full range of exertional work, but limited to understanding, remembering, and carrying out simple instructions and performing repetitive tasks without strict time demands or quotas. (Tr. 498–99).

The VE testified there were several jobs in the Dictionary of Occupational Titles ("DOT") a hypothetical person with these limitations could perform: a watch guard, a packager, a janitor, a material handler, and a cafeteria attendant. (Tr. 499–500). The VE also testified there were hundreds of thousands of material handler, janitor, and cafeteria attendant jobs existing in the national economy, and thousands of each job in northeast Ohio. (Tr. 500–01).

*The ALJ's Decision*

In 2009, the ALJ issued his decision. (Tr. 18–25). The ALJ found Plaintiff cleared the first four hurdles in the five-step analysis, but the Commissioner satisfied his burden at the last step. The ALJ found Plaintiff had "the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: understanding, remembering and carrying out simple instructions and performing repetitive tasks with no strict time demands or quotas such as assembly line production work." (Tr. 22). The ALJ also found there were a sufficient number of material handler, industrial janitor, and cafeteria attendant jobs in the national

6

and regional economies Plaintiff could perform. (Tr. 24–25). Accordingly, the ALJ found Plaintiff not disabled. Plaintiff initiated this action after the Appeals Council denied his request for review. (Tr. 9; Doc. 12, at 2).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD OF DISABILITY**

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

7

months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f) & 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff presents the following six arguments against the ALJ's denial of benefits:

1. Substantial evidence does not support the ALJ's determination Plaintiff could perform two semi-skilled occupations;

2. Substantial evidence does not support the ALJ's finding Plaintiff could perform three

>   occupations with reasoning levels above 1;
>
> 3. Substantial evidence does not support the ALJ's finding Plaintiff could perform three occupations with general learning abilities of 3 or 4;
>
> 4. The ALJ's residual functional capacity assessment and hypothetical question did not reflect his agreement Plaintiff needed a low-stress setting;
>
> 5. The ALJ made harmful errors regarding Plaintiff's education; and
>
> 6. The ALJ erroneously evaluated Plaintiff's work history.

Plaintiff also contends only five pages of his seventeen-page submission to the Appeals Council was included in the administrative record, and therefore requests the entire submission be included in the record. The Commissioner has not objected, and seeing no other reason to exclude these pages in the record, the undersigned grants Plaintiff's request on this issue.

**The Vocational Expert's Testimony**

Based on the VE's testimony, the ALJ found Plaintiff could perform three occupations that exist in significant numbers in the national economy: material handler, industrial janitor, and cafeteria attendant. (Tr. 24). The VE testified each of these jobs was unskilled and had a Specific Vocational Preparation ("SVP") level of 2. As it turns out, however, the VE was wrong. Both the material handler and industrial janitor occupations have SVP levels of 3, according to the DOT; only cafeteria attendant has a SVP level of 2.

In light of this error, Plaintiff argues substantial evidence cannot support the ALJ's decision because he found Plaintiff can perform jobs that are actually semi-skilled and not unskilled, as the ALJ believed. The Commissioner counters that because Plaintiff's counsel never objected to the VE's testimony at the hearing the ALJ had no duty to explain how the conflict between the VE's testimony and the DOT was resolved. In effect, the Commissioner argues Plaintiff waived this

9

argument.

While Plaintiff did not waive this particular argument by failing to raise it at the hearing, "it is not without consequence." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). The ALJ certainly has an affirmative responsibility under SSR 00-4p to ask a VE if his testimony conflicts with the DOT prior to relying upon it, *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 274 (6th Cir. 2006), and the VE did so (Tr. 501). However, "[b]ecause [Plaintiff] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved." *Id.* Contrary to Plaintiff's arguments, the ALJ was only required to develop the record by making a further inquiry if the conflict between the VE's testimony and the DOT was obvious enough the ALJ should have identified them without any assistance, as SSR 00-4p only requires ALJs to resolve *apparent* conflicts between the VE's testimony and the DOT.  SSR 00-4p, 200 LEXIS 8, at *9 ("*If* the VE's . . . evidence appears to conflict with the Dictionary of Occupational Titles, the adjudicator will obtain a reasonable explanation for the apparent conflict." (emphasis added)).

This Court does not believe the errors in the VE's testimony, in this instance, were apparent and therefore the ALJ was under no obligation to investigate further. The error here – the SVP numbers of two jobs – was not inherently obvious; indeed, the very reason VEs testify is because of their expert knowledge of the occupations contained within the DOT. The ALJ here was simply doing what many ALJs do: providing the VE with a hypothetical person mirroring the limitations of Plaintiff and relying on the VE to return an accurate list of jobs, if any, Plaintiff may be able to perform. Furthermore, Plaintiff did not challenge the accuracy of the VE's testimony on this point on cross-examination, which may have been enough to obligate the ALJ to make further inquiry. *See Overman*, 546 F.3d at 465 (finding that ALJ could not rely on VE testimony when on cross-

examination counsel elicited statements from the VE that "seriously called into question the reliability of the VE's bottom-line conclusions").

But even setting all this aside, the VE's description of the cafeteria attendant position was entirely accurate and Plaintiff is not challenging the accuracy of the VE's testimony on this point. This alone was enough for the ALJ to hang his hat on. *See Martin*, 170 F. App'x at 374 ("even if the two positions about which there were inconsistencies had been excluded, the ALJ still could have reasonably found that Martin could perform the third position of assembler"). The ALJ's reliance on the VE was not erroneous and his decision is supported by substantial evidence.

**Reasoning Levels**

Plaintiff next argues the ALJ erred because he found Plaintiff could only perform "simple" tasks, thereby limiting Plaintiff to positions with a reasoning level of 1 (the lowest level), yet relied on positions identified by the VE all with reasoning levels above 1(material handler, R2; industrial janitor, R3; cafeteria attendant, R2).

Plaintiff maintains that the ALJ's limitation of "carrying out simple instructions and performing repetitive tasks," (Tr. 22), comports most closely with R1 positions. The DOT defines reasoning levels 1 through 3 as follows:

> 01 Level Reasoning Development. Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
>
> 02 Level Reasoning Development. Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
>
> 03 Level Reasoning Development. Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

DOT, App'x C.

Although the ALJ found Plaintiff could perform only "simple" tasks, that does not automatically rule out the jobs identified by the VE. Indeed, many courts have so held, including some within this circuit. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (11th Cir. 2005) (holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart*, 91 F. App'x 210, 214–15 (3d Cir. 2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"); *see also Sims v. Comm'r of Soc. Sec.*, 2008 U.S. Dist. LEXIS 86077, at *17–22 (N.D. Ohio 2008); *Cooper v. Barnhart*, 2005 U.S. Dist. LEXIS 9934 (D. Me. 2005); *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850 (D. Minn. 2001).

In facing an argument similar to the one here, another court explained the reason why a limitation of simple tasks is not inconsistent with a reasoning level of 2:

> The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. [T. 19-20]. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved -- that is, not a high level of reasoning. Plainly, the VE's testimony did not contradict the ALJ's limitation, when considered in light of the DOT definitions.

*Flaherty*, 182 F. Supp. 2d at 850–851. The same is true here, especially in light of the tasks Plaintiff testified he is able to accomplish. Plaintiff testified he has worked a variety of jobs, including one at McDonald's that lasted for approximately three years. (Tr. 23, 476–477). He can perform general activities of daily living, including managing his own household affairs, going to restaurants, shopping, and watching after his children. (Tr. 492–97). Plaintiff can read and perform basic math. (Tr. 486–87). The ALJ's decision is not at odds with the DOT definition in light of this record.

And neither should the ALJ's decision be remanded because he found Plaintiff could perform the position of industrial janitor, which has a reasoning level of 3.  Some courts have found a R3 position is consistent with a limitation of "simple", repetitive tasks.  *See*, *e.g.*, *Hillier v. SSA*, 486 F.3d 359 (8th Cir. 2007) (concluding the plaintiff could perform the position of cashier, a level three reasoning job, even though the ALJ limited the plaintiff to positions where she could "understand, remember, and follow simple, concrete instructions").  In any event, this is of little moment here, considering the ALJ included two R2 positions as well. (Tr. 25).  Therefore, even removing from consideration the industrial janitor position, substantial evidence supports the ALJ's determination.

**General Learning Ability**

Plaintiff next contends the ALJ's finding that Plaintiff could perform three occupations with general learning abilities ("GLA") of 3 or 4 was not supported by substantial evidence.  Plaintiff argues that because the ALJ found Plaintiff had an IQ in the 70s, Plaintiff is in the bottom 4% of the population intellectually.  He argues the ALJ was required to exclude the bottom 10% of the population from consideration of performing the material handler and cafeteria attendant positions, and the bottom 33.33% of the population for the industrial janitor position, and therefore should have excluded Plaintiff.  Because of this discrepancy, Plaintiff argues, the ALJ should have obtained a reasonable explanation from the VE how a person with borderline intellectual functioning could perform these occupations.

Setting aside for the moment that the "finding" Plaintiff is in the fourth percentile intellectually is one he made, and not the ALJ, there are at least three reasons Plaintiff's argument is not  persuasive. First, as before, Plaintiff never raised this argument during the hearing, and because any conflict between the VE's testimony and the DOT was not apparent, the ALJ had no

13

obligation under SSR 00-4p to interrogate the VE further. *Martin*, 170 F. App'x at 374; *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).

Second, Plaintiff has not cited to any authority in support of this argument, let alone any authority standing for the proposition the ALJ was *required* to exclude Plaintiff from the occupations identified by the VE based on his IQ and the GLA scores without regard to any other evidence.

Finally, Plaintiff's argument completely ignores the evidence supporting the ALJ's finding Plaintiff is capable of performing the positions proposed by the VE. Plaintiff testified he worked in the past, including three years at McDonald's, and continues to seek work. At a consultative exam, Dr. Smith concluded Plaintiff can "deal with people and handle simple work." (Tr. 23). Plaintiff also testified he can read, perform many activities of daily living, use a computer, talk with friends, and ride the bus. (Tr. 493–97). This evidence supports the ALJ's conclusion Plaintiff has the residual functional capacity to perform a full range of work "limited to understanding, remembering and carrying out simple instructions and performing repetitive tasks with no strict time demands or quotas such as assembly line production work." (Tr. 23).

**Low Stress Setting**

Plaintiff next argues the ALJ determined Plaintiff needed a low-stress work setting, but failed to include that limitation in his hypothetical to the VE. In support, Plaintiff relies on the following portion of the ALJ's decision:

> While the State Agency concluded that the claimant retained the ability to perform simple repetitive tasks that don't have associated strict production quotas and are performed in a low stress setting *which is consistent with the finding of the undersigned Administrative Law Judge*, the State Agency also concluded that the claimant's instructions must be presented visually due to the claimant's limited reading level.

14

(Tr. 23–24 (emphasis added)). Plaintiff contends the ALJ adopted the State Agency's finding Plaintiff needed a low-stress work environment when the ALJ stated his decision "is consistent with" the State Agency's. Therefore, Plaintiff argues, the ALJ should have included this limitation in his hypothetical to the VE. The Commissioner counters the ALJ adequately accounted for this limitation by restricting Plaintiff to work with no strict time demands or quotas.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239, 241 (6th Cir. 2002)). On the other hand, "an ALJ is not required to rely on VE testimony as to limitations that the ALJ does not find credible and does not include in his RFC determination." *Clinkscales v. Astrue*, 2011 WL 3862088, at *10 (N.D. Ohio 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("it is well-established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.")).

A review of the ALJ's decision shows he did not need to introduce the low-stress limitation to the VE because the ALJ did not find Plaintiff needed to be limited in that way. The ALJ determined Plaintiff needed the following non-exertional limitations only: "understanding, remembering and carrying out simple instructions and performing repetitive tasks with no strict time demands or quotas such as assembly line production work." (Tr. 22).

The ALJ made no finding Plaintiff required a low-stress work environment. He merely stated his decision was "consistent with" the State Agency's finding that Plaintiff retained the ability

15

to perform simple repetitive tasks without time productions or quotas and are performed in a low stress environment. The ALJ's decision can be, and is, "consistent with" the State Agency's finding without adopting that finding wholesale. The limitations posed by the ALJ's hypothetical, and clearly articulated in his decision, were supported by substantial evidence.

**Plaintiff's Education**

Plaintiff also argues the ALJ erred in determining Plaintiff's educational level. On this point, Plaintiff makes three arguments: (1) Plaintiff's own testimony does not support the ALJ's finding Plaintiff had a "limited" education; (2) the hypothetical posed to the VE, with respect to education, is unreviewable because the ALJ did not specify what he meant by education; and (3) the ALJ erroneously found Plaintiff does not need work instructions presented to him visually.

In support of his first argument, Plaintiff notes he tested at the 4.2 grade level (Tr. 261), has a poor academic record (Tr. 100–103, 376), and took courses for the leaning disabled while in school (Tr. 69, 95–98). Plaintiff contends this evidence requires remand to the ALJ for a proper determination of Plaintiff's educational level.

If that were the entirety of the evidence, Plaintiff might be correct; but like many cases, there is more to the story. Plaintiff's argument fails to take into consideration he repeatedly testified he could read (Tr. 486, 495–96). In fact, Plaintiff told the ALJ he could read "fairly well", though he might need assistance with "big" words, and reads the newspaper. (Tr. 486). Plaintiff goes to the library with his children and reads them books. (Tr. 496). He also testified he could write a letter to someone. (Tr. 486). Plaintiff said that, although he has trouble with division and decimals, he can perform basic addition and subtraction and can make change at a cash register. (Tr. 486–87).

This testimony is in stark contrast to that of the claimant in *Skinner v. Sec'y of Health &*

16

*Human Servs.*, 902 F.2d 447 (6th Cir. 1990), upon which Plaintiff relies.  In that case, the claimant testified he could not read a newspaper and his examiner declared Skinner was "functionally illiterate" after Skinner tested at a third grade reading level.  *Skinner*, 902 F.2d at 448–49.  Skinner also completed, at most, schooling through the eighth grade.  *Id.* at 448. Skinner also lacked basic math skills and needed the assistance of another to transact business.  *Id.*  Indeed, the Sixth Circuit noted the record was "overwhelming" and "replete" with examples of Skinner's illiteracy and it appears the ALJ relied heavily on the highest grade Skinner completed to determine he had a "marginal" education.

Not so here.  The record demonstrates the ALJ's finding that Plaintiff had a "limited" education – that is, "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs," 20 CFR § 404.1564(b)(3) – is supported by substantial evidence. While the example Plaintiff provides may support his argument, that is not enough under the deferential standard of review by which these cases are governed.  *See Jones*, 336 F.3d at 477.  For these same reasons, Plaintiff's argument that the ALJ erred in determining he did not need visual instructions, is equally without merit.

The ALJ also did not err when he asked the VE to consider someone with Plaintiff's education.  (Tr. 498).  The VE was present during Plaintiff's testimony, including Plaintiff's testimony regarding his education, along with the Commissioner's counsel, defense counsel, and the ALJ (Tr. 474), and so there was no need for the ALJ to specify any further.  In any event, if Plaintiff or his counsel believed the hypothetical presented to the VE was ambiguous on this point, counsel had the opportunity to clarify it on cross-examination, but apparently chose not to do so.

**Plaintiff's Work History**

Finally, Plaintiff argues the ALJ erroneously evaluated Plaintiff's work history despite finding Plaintiff did not have any "past relevant work". Even though the ALJ found Plaintiff did not have any "past relevant work" at step four of the analysis in determining disability, that does not preclude him from considering the jobs Plaintiff did in the past at step five. Indeed, federal regulation expressly permits the ALJ to do so:

> Other work. If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

20 CFR 404.1560(c)(1).

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying DIB and SSI benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

                                           s/James R. Knepp II
                                        United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).